## 16575

### STATE v. HARVEY
(68 S. E. (2d) 409)

*Messrs. Aaron Kravitch,* of Savannah, Georgia, *and Basil W. Hall,* of Beaufort, *for Appellant,*

*Mr. Randolph Murdaugh, Soilicitor,.* of Hampton, *for Respondent.*

December 17, 1951.

OXNER, Justice.

Upon an indictment charging him with the murder of Aubrey Godley on February 17, 1951, appellant was tried at the March, 1951, term of the Court of General Sessions of Beaufort County. He admitted the killing and interposed a plea of self-defense. The trial resulted in a verdict of guilty of murder and sentence of death by electrocution.

The first question which will be considered is whether the evidence was sufficient to support a conviction of murder. Appellant contends that the State failed to prove that the offense was committed with malice aforethought and that the highest degree of homicide shown by the evidence was that of manslaughter. The determination of this question necessitates a review of the testimony.

Appellant is a Negro, about forty years of age. He has resided in Beaufort County all his life with the exception of approximately three years during World War II when he was in the army. At the time of the homicide he was living on Ladies Island and attending a school located about eight miles away under the GI Bill of Rights.

The deceased, Aubrey Godley, was a white man about 29 years of age. During the late afternoon of February 16, 1951, Godley, Wilson Lee McAlhaney and Lonnie Godley gathered at the place of business of W. C. Swain. They purchased some liquor and later went on a pleasure ride in Swain's car, a four door automobile. They rode for several hours, talking and singing. During the evening they stopped at one or two places to get beer and finally went to Buckmeyer Beach. About midnight they decided to return home. At this time AcAlhaney was driving, with Aubrey Godley on the front seat with him. Swain and Lonnie Godley were on the back seat. When they reached a point on Ladies Island about 200 yards from Lonnie Godley's house, the driver stopped the car on the side of the road. He cut off the ignition and turned on the parking lights. Swain, who is about 37 years of age and the only surviving witness, gave substantially the following version of what then occurred:

He did not know why the driver stopped. None of the occupants asked him to do so. He does not recall how long they had been parked before the homicide occurred. As they sat there either talking or singing, Swain heard one of his companions on the front seat remark, "who in the hell is that?" This was the first Swain knew of anyone approaching. He looked up and saw a man walking along the right side of the car. When this man reached the right front window, he asked: "What in the hell is all the racket about?". Aubrey Godley replied, "who in the hell wants to know?". About this time McAlhaney, the driver, got out of the car and started walking toward the rear, followed by Lonnie Godley. Aubrey Godley then proceeded to get out and just as his feet hit the ground, two shots were fired. Aubrey Godley thereupon called to Swain, who was preparing to get out of the car, to "lie down", Swain then slipped down in the seat. About this time Aubrey Godley dashed toward the front of the automobile. Three or four more shots were fired, after which there was silence. Shortly thereafter Swain got out of the car and found that his companion had been

shot. He stopped a passing automobile for the purpose of notifying the sheriff and sending for an ambulance.

The sheriff and one of his deputies promptly answered the call. Upon arriving at the scene, they found McAlhaney lying dead near the right rear fender of the car. He had been shot through the heart. Aubrey Godley was found dead under the front part of the car with his legs protruding. He had been shot on the right side about six inches below the armpit. There was testimony tending to show that the bullet ranged upward and came out through his left cheek. Lonnie Godley was shot in the back of the head and was found by the sheriff about 150 yards from the scene of the homicide, to which point he apparently walked after being shot. He was removed to a hospital and died on the following day. All three men were shot with a .45 automatic pistol. Five shells were found scattered behind the right rear of the car and one shell about two feet from Aubrey Godley's legs. There is no evidence that any of the four men in the car had a pistol, knife or any other weapon.

Within about an hour after the homicide, appellant, whose home was near the scene of the shooting, was arrested and at daybreak removed to the State Penitentiary in Columbia. That afternoon he confessed that he had done the shooting.

It was the theory of the State, and there is substantial evidence tending to support it, that deceased, Aubrey Godley, was shot while trying to escape by crawling under the front of the car and after the other two men had been shot.

It is undisputed that appellant was seen with a .45 automatic pistol in his hand at several places on the night of the homicide, although there is no evidence that he undertook to assault anyone with it. He said that this pistol had been pawned to him about a month prior to the homicide and on the night in question he had taken it with him for the purpose of pawning it to someone in order to raise money for use until payday. He gave no satisfactory explanation as to why it was loaded.

Appellant, after stating that in returning home about midnight he saw a car parked along the side of the road about two hundred yards from his house, gave the following version of the occurrence:

"Mr. Kravitch: What was it they said? A. When I got about mid-ways of the car, one of them said, 'hey', I thought somebody knew me and why they were down there.

"Q. Did you know whether they were white or colored? A. No, sir, I figured somebody knew me, and they hailed me and the reason I figured they knew me, and I said, 'behold thy brother,' I walked up to get in the back of the car, and then three men fell out of the car, I stood watching them, and I still did not see they were white because it was in the night, and I got back up against the rear of the automobile, and where one of them walking up to me, and he said, 'you know where we can find * * *?' (words omitted show that the inquiry here made was for a Negro woman for immoral purposes), and I said, 'No, sir', I see it was white men then, and I said, 'the old girl was around here and they done run her away from around here', and he said he do not believe it. Then, he walked on up coming to me, and three around there at that time, and one said, 'Kill him,' and I did not know whether the other ones were back to the car, and I could not get around three of them, and I did not want to have any special trouble, and I just shot.

"Q. What did you do after the shooting? A. I ran across the field and went home * * *."

On cross-examination, he testified in part as follows:

"Q. And as I understand as you were going by this car these boys were out there singing? A. I never heard them singing.

"Q. One of them got out of the car? A. Three of them got out of the car.

"Q. And one had to get out and the others did? A. Three got out. One came up to me who was a big fellow.

"Q. And the one that came up to you was a big fellow? A. Yes, sir.

"Q. And the first thing they said, 'hey'? A. Yes, sir.

"Q. And you said, 'Behold thy Brother'? A. Yes, sir.

"Q. And the one that came down there was a big fellow? A. Yes, sir.

"Q. And he walked over to you and asked you about some * * * ? (Negro woman for immoral purposes) A. What he said.

"Q. And then you said nothing like that around here. A. And then he hit me. He said, 'You are not telling the truth', and I said, 'I am telling the truth'. And then he hit me.

"Q. What did he hit you with? A. With his bare hand.

"Q. His bare hand? A. Yes, sir.

"Q. Did you tell your counsel on direct examination anything about him hitting you? A. If I did not, I meant to tell him. I do not believe I did and I forgot that.

"Q. What did the other two do? A. One of them said, 'Kill him,' and the other two were around there.

"Q. What did you do? A. I was backing and wheeling back from them, and then I pulled out the pistol and started shooting."

It is proper to add that there was no evidence that appellant was drinking at the time of the homicide.

In the foregoing résumé of the evidence, we have included that offered by appellant, although in determining the sufficiency of the evidence to sustain a conviction of murder, the evidence and the inferences which may reasonably be drawn therefrom must be viewed in the light most favorable to the State. *State v. Francis,* 152 S. C. 17, 149 S. E. 348, 70 A. L. R. 1133; *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769.

Considering the evidence from the above viewpoint, does it warrant a conviction of murder? The statutory definition of that offense is, Section 1101 of

the 1942 Code: "Murder is the killing of any person with malice aforethought, either express or implied." Malice is an essential ingredient of murder. Perhaps the definition of malice most often quoted is that stated in *State v. Doig,* 2 Rich. 179, which is as follows: "In law, malice is a term of art, importing wickedness and excluding a just cause or excuse." In *State v. McDaniel,* 63 S. C. 304, 47 S. E. 384, 387, the Court stated: "An intentional homicide, without any excuse, is certainly murder." While in order to prove murder it must be shown that the killing was done with "malice aforethought", it is well established that malice need not exist for any particular length of time prior to the killing. *State v. Cooper,* 212 S. C. 61, 46 S. E. (2d) 545. In discussing the meaning of the phrase "malice aforethought", we stated in *State v. Judge,* 208 S. C. 497, 38 S. E. (2d) 715, 719:

"In the comparatively recent case of *State v. Heyward,* 197 S. C. 371, 15 S. E. (2d) 669, 671, this Court quoted with approval the following definition of malice from *State v. Gallman,* 79 S. C. 229, 60 S. E. 682: ' "It is a wicked condition of the heart. It is a wicked purpose. It is a performed purpose to do a wrongful act, without sufficient legal provocation; and in this case it would be an indication to do a wrongful act which resulted in the death of this man, without sufficient legal provocation, or just excuse, or legal excuse." * * * '; and from 29 C. J., 1084: ' "In its popular sense, the term 'malice' conveys the meaning of hatred, ill-will, or hostility toward another. In its legal sense, however, as it is employed in the description of murder, it does not of necessity import ill-will toward the individual injured, but signifies rather a general malignant recklessness of the lives and safety of others, or a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief; in other words, a malicious killing is where the act is done without legal justification, excuse, or extenuation, and malice has been frequently, substantially so defined as consisting of the intentional doing of a wrong-

ful act toward another without legal justification or excuse." '

"With reference to the word 'aforethought,' we quote the language of the court in *State v. Milam,* 88 S. C. 127, 70 S. E. 447, 449:

" '* * * While there may be and probably is some distinction between "malice" and "malice aforethought," the latter conveying more the idea of premeditation and design, and being, therefore, more intense in respect to the wickedness of heart involved than in the word "malice" alone, still·the word "aforethought" is usually understood to refer rather to the time when the evil intent is conceived. The authorities agree that it need not exist for any appreciable period of time before the commission of the act,—indeed, it may be conceived at the very moment the fatal blow is given. It is sufficient in law if the combination of the evil intent and act produce the fatal result. 2 Bish. Cr. L. 677.' "

Voluntary manslaughter is usually defined as the unlawful killing of a human being in sudden heat of passion upon a sufficient legal provocation. It is well settled in this State that where death is caused by the use of a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation. *State v. Gardner,* 219 S. C. 97, 64 S. E. (2d) 130.

We think the evidence was sufficient to sustain a conviction of murder. It was for the jury to determine, in the event that body found appellant guilty of unlawful homicide, whether the offense was that of murder or manslaughter. The jury evidently rejected appellant's version of the homicide. It could be reasonably inferred from the evidence offered by the State, considered in the light of all the surrounding circumstances, that the killing was without any legal justification or excuse. This conclusion is fully sustained by the following decisions: *State v. Francis, supra,* 152 S. C. 17, 149 S. E. 348, 364; *State v. Heyward,* 197 S. C. 371, 15 S. E. (2d) 669; *State v. Judge,*

supra, 208 S. C. 497, 38 S. E. (2d) 715; *State v. Cooper,* supra, 212 S. C. 61, 46 S. E. (2d) 545.

It is further contended that the trial Judge erred in refusing a new trial on the ground that the verdict was against the greater weight of the evidence. This was a matter addressed to the sound discretion of the Court below. Our inquiry is confined solely to the question of whether there is any evidence reasonably supporting the verdict of the jury. We have concluded that there was. It is not the function of this Court to pass upon the weight of the evidence. The power to grant a defendant a new trial on the ground that the verdict rendered against him is unjust as to the facts is vested alone in the trial Judge; it is not with this Court. In *State v. Francis, supra,* 152 S. C. 17, 149 S. E. 348, 364, the Court said: "We think it not out of place to once again call attention to the fact that in criminal cases, even in those where men have been sentenced to death, this court, under the Constitution of this state, is absolutely limited to the correction of errors of law. Excepting only when we must examine into the facts for the sole purpose of ascertaining if there has been error of law in the court below, this court has nothing whatever to do with the facts in the case."

It should be further stated that under the law of this State, where a defendant is found guilty of murder, it is for the jury to determine whether mercy shall be extended and thereby reduce the sentence from death to life imprisonment. Clemency to one to whom the jury has refused to extend mercy is a matter for the executive branch of the government. "We are not intrusted, under the law, with the dispensation of mercy." *State v. Williams,* 166 S. C. 63, 164 S. E. 415, 427.

It is argued that appellant has been deprived "of his life contrary to the Fourteenth Amendment to the Constitution and the laws of the United States and the Constitution and laws of the State of South Carolina."

Appellant has pointed to no law of this State or of the United States which has been denied him. There is no basis whatsoever for this contention. The record furnishes no support for the claim of discrimination. Appellant received a fair and impartial trial in the course of which he was represented by experienced counsel with commendable zeal and ability. He was denied no right accorded to others charged with unlawful homicide.

It is next contended that the Court erred in admitting a confession made by appellant. He was arrested within an hour or two after the homicide and questioned from time to time by the sheriff and his deputy until about daylight. He was then removed to the office of the Chief of the State Constabulary in Columbia, where he was again questioned by the officers and during that afternoon confessed to the killing. No improper methods were used to obtain this confession. It was voluntarily made. There is nothing in the record to show that appellant was threatened, abused, or ill-treated. In fact, he seems to disclaim any such contention. In the recent case of *United States v. Carignan*, 342 U. S. 36, 72 S. Ct. 97, the Court stated: "So long as no coercive methods by threats or inducements to confess are employed, constitutional requirements do not forbid police examination in private of those in lawful custody or the use as evidence of information voluntarily given." Moreover, the admission of this confession could not have prejudiced the rights of appellant, for it is conceded, and the record shows, that appellant made no statement of an incriminating nature to these officers during the investigation which he did not admit in his own testimony at the trial of the case.

Finally, it is claimed that the Court erred in refusing the following instruction requested by appellant's counsel: "If an insult was offered to the defendant, such as for instance the use of this expression, which has been brought out in the testimony, which would be resented by a negro and that was sufficient to gender him in the heat of blood, that it

would not be necessary for the defendant to prove that in order to reduce the crime the burden would be upon the State and not upon the defendant to prove that in his defense of self-defense."

It is difficult to determine the purpose or meaning of the above request. The Court would have been fully justified in refusing it upon the ground that it was indefinite, ambiguous, and confusing. The trial Judge declined the request, however, upon the ground that he had already "covered that phase of it." If it was the desire of counsel that the jury be charged that the burden was upon the State to prove malice and the other essential ingredients of the offense of murder, undoubtedly that phase of the law had been fully covered in the general charge. If counsel for appellant intended by this request, as seems to be argued in the brief, that the jury should be instructed to the effect that the insulting inquiry claimed by appellant to have been made of him was sufficient to reduce the homicide from murder to manslaughter, the request was erroneous, for, as we have previously pointed out, where death is caused by the use of a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation. Of course, "[w]ords accompanied by hostile acts may, according to circumstances, not only reduce a killing from murder to manslaughter, but may establish the plea of self-defense." *State v. Mason,* 115 S. C. 214, 105 S. E. 286. But the request did not embody this principle. In the general charge the jury was fully instructed as to the elements of both murder and manslaughter. The Court also went very carefully into all phases of the law of self-defense. For the foregoing reasons, we find no error in the refusal of the foregoing request.

The argument is also made that the jury should have been instructed to the effect that if they had a reasonable doubt as to whether appellant was guilty of murder or manslaughter, it was their duty to resolve that doubt in his favor and find him guilty of the lesser offense. That phase

of the matter was fully covered in the general charge. The Court specifically instructed the jury "that the defendant is entitled to the benefit of any and every reasonable doubt on any and every phase of the case, including whether defendant is guilty of murder or manslaughter, if guilty at all."

As usual in cases of this kind, we have, *in favorem vitae,* carefully examined the record for any errors affecting the substantial rights of the accused, even thought not made a ground of appeal. We find none. Having concluded that the evidence was sufficient to sustain the verdict and finding no errors of law in the trial, we are not warranted in disturbing the verdict and sentence imposed.

Affirmed.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.