17489

STATE, Respondent, v. Tillman TRENT, Appellant

(106 S. E. (2d) 527)

*Messrs. Thomas W. Whiteside* and *T. Louis Cox,* of Spartanburg, *for Appellant,*

*Messrs. J. Allen Lambright, Solicitor,* and *J. Wright Nash, Assistant Solicitor,* of Spartanburg, *for Respondent,*

January 13, 1959.

OXNER, Justice.

At about eleven o'clock on the morning of July 12, 1957 appellant, Tilman Trent, killed Alton Otis Goode with a shotgun. He was tried in October, 1957 and found guilty of murder. The jury recommended mercy and appellant was sentenced to imprisonment for life.

The exceptions raise three questions. We shall first discuss the contention that the Court erred in refusing to reduce the charge from murder to manslaughter. Appellant asserts that the testimony does not support an inference of malice.

Sam Trent, father of appellant, owned and operated a fish pond and store near the town of Cowpens in Spartanburg County. Appellant, who is about 32 years of age, lived in a house located parallel to and about 50 feet from the store and

assisted his father in the business. A path led from the front of the store to the front of the house. The fish pond was behind these buildings. Apparently Sam Trent was not on friendly terms with the deceased, a man about 40 years of age, and had warned him not to come about his place of business. Three or four days prior to the homicide Sam Trent procured a warrant charging the deceased with assault and battery with intent to kill which a friend of the deceased had sought to induce him to withdraw.

About 7:00 o'clock on the morning of the homicide, deceased drove one Donald Fowler to Spartanburg to see about getting a job. They were accompanied by B. O. Fortner. While in Spartanburg they drank some wine. Fortner left them there and caught a bus. Fowler and deceased returned and near Cowpens gave out of gas. Shortly thereafter they ran across appellant and the three of them drank some "homebrew". Fowler then left and appellant and deceased proceeded to the rear of Trent's store and drank more homebrew, after which appellant went home and deceased went into the store and inquired as to the whereabouts of Donald Fowler. Sam Trent and several customers were in the store. There is a dispute as to what occurred there. Sam Trent testified that after seeing deceased open a small knife he decided, in view of threats previously made against him, to leave, and that as he ran out the front door, deceased "slashed" at him with the knife and cut his shirt. This testimony was contradicted by the State's witness who said that nothing occurred between these two men in the store.

After leaving the store, Sam Trent went to the home of his son, the appellant. The deceased left a few minutes later. There is a further dispute as to what then occurred. The State's witnesses said that after Sam Trent passed through the house, appellant went into a room and got a gun; that his wife tried unsuccessfully to get him to put it down; that he walked from his house a distance of about 40 feet toward the deceased who was standing about 5 or 10 feet from the front of the store; that the deceased remarked, "Till, I ain't done

a thing to you"; and that appellant shot him when they were about 20 or 25 feet apart.

Sam Trent testified that he went to his son's home to get his car to "go after the law" and that as he passed through the house he did not tell his son that his shirt had been cut. Appellant testified that his father ran through the house saying, "There is a man trying to kill me"; that he then got his gun and walked to the front of the house where he saw deceased coming toward him from the front of the store. He further testified:

"Well, we walked on up to about fifteen feet of each other, and I stopped and I told him, I said, 'Now, Head,' I said, 'Go on,' I said, 'We don't want no trouble out here,' and he looked at me and he run his hand in his pocket, and he said, 'I'm going to cut your God damn head off.' And I said, 'Head, no stop,' and he just kept walking towards me, and when he run his hand in his pocket I pulled my gun up and shot him."

After the homicide the officers searched the deceased but only found a small unopened knife in his right hand pocket. The load from the shotgun entered deceased's neck and face. Death resulted shortly thereafter.

On the foregoing testimony the trial Judge left it to the jury to determine, in the event that body found appellant guilty of unlawful homicide, whether the offense was that of murder or manslaughter. Of course, he also submitted to the jury the issue of self-defense. This defense was rejected and appellant was found guilty of murder. It is well settled that in determining whether the evidence is sufficient to sustain the verdict of the jury, it and the inferences which may reasonably be drawn therefrom must be viewed in the light most favorable to the State. *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769; *State v. Harvey,* 220 S. C. 506, 68 S. E. (2d) 409. We think the evidence offered by the State, considered in the light of all the surrounding circumstances, is sufficient to sustain the verdict. *State v. Judge,* 208 S. C. 497, 38 S. E. (2d) 715; *State v. Harvey, supra,*

220 S. C. 506, 68 S. E. (2d) 409; *State v. Primes*, 223 S. C. 540, 77 S. E. (2d) 193; *State v. Jenkins*, 228 S. C. 12, 88 S. E. (2d) 770.

The net question is whether the Court erred in refusing to charge the following request by appellant:

"Where a house, premises or place of business is jointly occupied, used and possessed by two persons, as by partners, joint tenants or tenants in common, each joint occupant being equally entitled to possession, need not retreat when attacked while in the building or premises by the other joint occupant. The rule is the same whether the attack proceeds from some other occupant or from an intruder."

The trial Judge stated in his remarks refusing a motion for a new trial that he was under the impression that he had given this request and his charge rather indicates that his failure to do so was an oversight. Be that as it may, there was no prejudicial error. Nowhere was there any instruction that the defendant was under a duty to retreat. On the contrary, the jury was instructed that if a person is attacked within the curtilage of his dwelling, in his place of business or other place "lawfully occupied by him", "he is not bound to retreat in order to invoke benefit of self-defense, but may stand his ground and repel the attack with as much force as is reasonably necessary", and that under such circumstances he may eject his assailant from the premises and use such force as may be reasonably necessary to "accomplish the expulsion." The jury was further instructed that this right extended to the defense of one "who bears to him relationship of wife, parent or child."

The undisputed evidence shows that appellant shot while standing within the curtilage of his home. His immunity from the law of retreat was fully protected by the foregoing instructions.

The remaining question is whether the Court erred in refusing a motion for a new trial upon the ground that two jurors took notes of the testimony and

charge. The fact that these two jurors took notes and carried them to the jury room is conceded but the record does not disclose the extent of the note taking. Their action was observed both by the trial Judge and the Solicitor. It is admitted that one of the attorneys for appellant saw the two jurors taking notes of the testimony but they say they did not see any juror taking notes of the charge. In refusing the motion for a new trial, the Court said that the action of the jurors "was so obvious to everyone in the courtroom that if there had been any objections to the taking of the notes, I think it should have been made during the progress of the trial."

We would not be warranted in disturbing the conclusion of the trial Judge that counsel for appellant in the exercise of due diligence should have known of the conduct now complained of. As stated in *Swift & Co. v. Bleise,* 63 Neb. 739, 89 N. W. 310, 313, 57 L. R. A. 147: "It is difficult to conceive how this could have happened to any great extent in a public trial without coming to a diligent defendant's knowledge, and if it did, of course, error would be waived if no objection was taken." In answering a contention of counsel that they did not know until after the trial that a juror was taking notes, the Court in *Commonwealth v. Tucker,* 189 Mass. 457, 76 N. E. 127, 142, 7 L. R. A., N. S., 1056, said: "In a certain sense that may be true, and yet, if they saw the juror writing while the evidence was going in they should be held to reasonable diligence in ascertaining what he was doing."

Assuming error in taking the notes, it was waived by failing to object thereto during the trial. See annotation in 154 A. L. R. at page 885. We could stop here but in view of the importance of the question, we think it should be discussed on the merits.

There are a few cases holding that it is improper for a juror to take notes of the evidence and that a trial Judge may forbid his doing so. The reasons behind the prohibition were stated in *United States v. Davis,* C. C., 103 F. 457, 470, as

follows: "It gives the juror taking notes an undue influence in discussing the case when he appeals to his notes to settle conflicts of memory. Without corrupt purpose, his notes may be inaccurate, or meager or careless, and loosely deficient, partial, and altogether incomplete." And in *Cheek v. State*, 35 Ind. 492, as follows: The taking of notes "was well calculated to divert the attention of the jurors while they were busy, pencil or pen in hand, from the evidence, as it would naturally be progressing while such notes were being made. The juror is to register the evidence, as it is given, on the tablets of his memory, and not otherwise. * * * The jury should not be allowed to take the evidence with them to their room, except in their memory. It can make no difference whether the notes are written by a juror or by some one else. Jurors would be too apt to rely on what might be imperfectly written, and thus make the case turn on a part only of the facts." For a more recent statement of the foregoing views, see *Thornton v. Weaber*, 380 Pa. 590, 112 A. (2d) 344.

In answering such argument, the Court in *Davis Die Co. v. Beltzhoover Electric Co.*, 40 Ohio App. 308, 178 N. E. 418, 419, said:

"It is urged that the notes might be taken incorrectly and thus improperly influence the jurors in their deliberations. Certainly there would be as great danger of error upon the 'tablets of their memory' as upon the tablets in their hands. In the days when fewer men could read or write it might have been possible for one who could do so to use these abilities improperly. Today it is hardly likely that such a state of affairs would exist. While the stability of rule and precedent is desirable, it is not so important as to require inflexibility in the presence of changed conditions, indicating the necessity, or at least reason, for adaptation to modern conveniences and practices adopted by men in the conduct of the ordinary affairs of life."

In the recent case of *United States v. Campbell*, D. C., 138 F. Supp. 344, 352, the Court, after an extended and interesting review of the authorities, stated:

"In the opinions of some of the appellate courts which disapprove the taking of notes by jurors, the view is expressed that where one or more of the jurors take notes they will in the event of disagreement in the jury room as to the evidence given by a certain witness or witnesses persuade the other members of the jury to accept their version of such testimony even though such version might be erroneous. In the days prior to the advent of court reporting, in the event of disagreement among the jurors as to certain testimony, there would not have been any satisfactory way of verifying what a witness or witnesses did actually testify. Since the advent of court reporting, when jurors get into a disagreement as to certain testimony, they can and do request that the testimony in question be read to them by the reporter."

Judge Learned Hand, speaking for the Court, in *United States v. Chiarella*, 2 Cir., 184 F. (2d) 903, 907, had this to say:

"The notion has at times been countenanced that jurors should not be allowed to take notes, on the theory that they take on an undue importance when the jury deliberates. * * * The supposed dangers appear to us far-fetched, if not imaginary; but even if we are wrong, it has never been suggested that the judge must *permit* the practice; the question has always been whether he must *forbid* it. Moreover, it is at most a matter of discretion."

In a number of States there are statutes permitting the taking of notes by jurors but the overwhelming weight of authority is to the effect that apart from statute the matter of note taking by jurors rests largely in the discretion of the trial Court. 53 Am. Jur., Trial, Section 851; 89 C. J. S. Trial § 456; Annotation 154 A. L. R., page 878. We are impressed with the soundness of this view. As are many other matters arising during a trial, much must be left to the common sense and good judgment of the trial Judge who in the exercise of his discretion will, of course, take into consideration the nature of the case and the extent to which notes are taken.

There is less authority on the question of taking notes during the charge. It would seem only in an exceptional situation would it be necessary for a jury to take notes of the instructions. Here again, however, much must be left to the sound discretion of the trial Judge.

In conclusion, attention is called to the fact that the foregoing discussion has been confined to the practice of note taking by jurors on their own volition and not at the direction of the Court or at the request of counsel, a distinction recognized in some of the cases.

Affirmed.

STUKES, C. J., and LEGGE and Moss, JJ., concur.

TAYLOR, J., concurs in part and dissents in part.

TAYLOR, Justice (dissenting in part).

I do not agree with that portion of the Majority Opinion which permits the taking of notes by a juror upon the charge.

In all testimony there are salient and important points and some testimony more or less cumulative or of lesser importance; and a juror being the judge of the facts is the sole judge of the weight to be accorded such testimony. He may accept such portions as he sees fit and completely reject others. He is not permitted to do so, however, with respect to the charge. He must accept the charge as given by the trial Judge as a whole. No portion thereof is more or less important than any other, and he will not be permitted to disregard any portion thereof. It is, therefore, incumbent upon the Court to see that a juror's attention is not distracted from any portion of the charge by taking notes or otherwise.

Further, I know of no person, untrained in the legal profession, capable of correctly making notes on a proposition of law as it is given by the trial Judge in his charge. It is true that a juror may get an erroneous concept of the law applicable to the case, but such erroneous idea would be less persuasive if he is not permitted to put it in writing.

I would, therefore, permit the taking of notes, within the discretion of the trial Judge, on the testimony but not permit the taking of notes on the charge.