17635

STATE, Respondent, v. Robert "Bozo" JOHNSON, Jr., Appellant

(113 S. E. (2d) 540)

*W. Newton Pough, Esq.,* of Orangeburg, *for Appellant,*

*Messrs. Julian S. Wolfe, Solicitor,* and *Marshall B. Williams,* of Orangeburg, *for Respondent,*

April 4, 1960.

STUKES, Chief Justice.

Upon an indictment containing three counts, (1) rape, (2) assault with intent to ravish, and (3) assault and battery of a high and aggravated nature, appellant was convicted of assault with intent to ravish and sentenced to death. Sec. 16-72, Code of 1952.

He is a young Negro man, twenty-nine years old, and the prosecutrix a white spinster of fifty-two. Their rural homes are separated by about five hundred yards of open

field. Hers is her life-long home, in which she occupies a rear apartment that opens on a back porch. It is separated by a breezeway from the living quarters of her brother and his wife. On this occasion they left her at home temporarily alone at about ten o'clock at night. Appellant, from the road in front, saw them leave and entered the premises by another driveway, without their knowledge.

Except as to the nature of the ensuing physical encounter, there is no material conflict between the testimony of the appellant at the trial and the evidence for the State. The prosecutrix had retired when appellant attracted her attention at the back door and asked to buy eggs. She got the eggs for him, opened the door to make the sale and, she testified, he attacked her, pulled her out of her kitchen, off the adjoining porch and across the yard, meanwhile brutally beating her with his fists, to a darkened area where he sexually assaulted her despite her resistance and screams for help. The latter were heard by an aged colored neighbor who lived about a quarter mile away. He and his granddaughter went to the rescue, causing appellant to flee, and found the prosecutrix whom he assisted to her feet and into the house, then left to give the alarm. Other neighbors, officers and a doctor soon came. The latter treated the prosecutrix at home and had her moved by ambulance to a hospital. The physician who treated her there saw her first in the emergency room when she was brought in at about midnight. The following is from his testimony:

"Doctor, would you describe her condition to the Court and jury when you first saw her? A. Generally, she was hysterical and upon first seeing her she was noted to have bruises about both eyes, chin, the angle of the left jaw, the right shoulder, the right posterior back, the left lateral chest and anterior neck. In addition she had lacerations of the upper middle lip, the lower left tongue and about the right side of the throat just in front of the right tonsil. She also had a severe sprain of the left knee and also brush burns about both knees. X-rays revealed a fracture of the left tenth

rib. It was necessary for her to be in a sitting position because of difficulty in breathing.

"Q. Doctor, as a result of the examination you made, what did you do then in treating this lady? A. Well, she was given sedatives and then she was admitted. Should I continue with the treatment on her?

"Q. Yes, go right ahead. A. Of course, she was treated, the lip sutured, stitches taken in her lip before she was admitted, in the emergency room. She was treated for the bruises and she was given general and supported treatment and then finally discharged from the hospital on the 15th of July.

"Q. How long did she remain in the hospital, Doctor? A. That was about eight days.

"Q. Dr. Wolfe, have you seen her since she was released from the hospital? A. Yes, sir, I have. I seen her on three occasions at my office as an outpatient. I last saw her on September 11, 1959."

The prosecutrix identified appellant as her assailant and the officers went to his nearby home and arrested him. He produced the clothes that he had been wearing and they had fresh bloodstains. He was taken to the State Penitentiary that night and the next morning to the headquarters of the State Law Enforcement Division (SLED). There he signed a statement in the presence of officers who testified that it was voluntary, without threat or promise of reward, and after warning that it might be used against him, and after offer to call counsel, friends or family. Because one of the grounds of appeal is concerned with the admission in evidence of it, we quote a portion of the statement, as follows:

"When the car went out this side of the road I went on the other side and I saw this lady walk across the house and I went up by the railing on the porch by the window. This lady must have heard me or seen me because when she walked up to this door and asked me what I wanted and asked me 'what are you doing out there nigger'? I had a sock on my right hand to keep from leaving a print on the window sill.

I had took my shoes off and had the sock on my hand. I told her I wanted two dozen eggs, I was going to pay for the eggs and then walk away. She asked me what was wrong with my hand and I told her I cut my hand, she come on with the eggs, she held them back and kept looking at me and dropped the eggs then grabbed ahold of me and started hollering for help and I was trying to get away from her. I backed down the steps on my knees and she went down and I got up and tried to get away from her. I was trying to hold my hand over her mouth. Something fell out of her mouth it must have been her false teeth or something like that, then I struck her, I tried to hit her back of the neck about three times. Then after that I hit her again with my fist after we got out by the car shed. She let go of me and fell to the ground and that is when I took off. I heard somebody calling, a man or lady. I left and come across the field and went home."

It is seen that rather than a confession of the crime of which appellant was convicted, it is exculpatory in nature.

Witness for the State testified to bloodstains on the porch and evidences on the ground of struggle in the yard, weeds and grass mashed down at the alleged place of the culmination of the attack.

The first ground of appeal relates to the admission in evidence of a photograph of the home of the prosecutrix which appellant's counsel refers to as State's Exhibit No. 1. It was printed in the brief "2" and changed by marking through with pencil. However, it appears from the following that counsel was correct in the first place, and the exhibit to which he refers is No. 2; there was no No. 1 before the jury.

One of the officers had taken, and produced at the trial, eight photographs of various views of the premises which, at the suggestion of the court, he numbered 1 to 8. *In the absence of the jury* the pictures were considered by court and counsel. No. 1 was objected to by counsel for appellant but

the court indicated that it would be admitted. Transcript, folio 265. However, when the jury was recalled and the trial proceeded the State did not offer No. 1 in evidence, but began with No. 2. Tr. f. 274. No picture or Exhibit No. 1 was admitted in evidence. This has been verified by this court by examination of all eight photographs, those which were admitted in evidence, Exhibits Nos. 2 to 8 inclusive, and photograph numbered 1 by the photographer, which has been furnished to the court by the Solicitor from his file. Incidentally, it is unobjectionable, but it was never before the jury. There is little, if any, difference between it and No. 2, to which counsel made no objection, and there was no basis for objection.

All of the pictures have been examined with care (including No. 1 which was not in evidence) and there is nothing in any of them which was calculated to inflame or arouse the sympathy or prejudice of the jury. They do not come within the rule of *State v. Jones,* 201 S. C. 403, 23 S. E. (2d) 387, 390 cited in the brief. Rather, they fall within the following conclusion in the opinion in that case: "Two of them (photographs) showed parts of the premises where the homicide actually occurred and were clearly not subject to objection." Incidentally, out of an apparent abundance of caution the court excluded from evidence the articles of clothing which the officers had taken from appellant on the night of the occurrence. This is mentioned to show the care with which the case was tried.

Error is assigned on account of the failure of the trial court to instruct the jury relative to the admissibility of extra-judicial confessions, the necessity of the voluntariness of them and the function of the jury to determine that issue, if present, and their right to believe or disbelieve them in whole or in part. There was no objection by counsel to the admission in evidence of the statement given by the appellant to the officers, as recounted and quoted from above, and their testimony was to the effect that it was entirely voluntary, which was not contradicted although appellant testified;

indeed, it was confirmed by him in testimony, as will be seen. However, we shall consider the point because this is a capital case.

It has been held that it is reversible error for the court to fail to instruct the jury concerning a confession, the admissibility, weight of it, etc., when such is received in evidence in a death case although there is no request for such instructions, as there was none here. *State v. Clinkscales*, 231 S. C. 650, 99 S. E. (2d) 663. But in this case appellant's testimony upon trial was in substance the same as the statement, so there could not have been any prejudice to him. *State v. Harvey*, 220 S. C. 506, 517, 68 S. E. (2d) 409. On direct examination by his counsel he testified concerning his statement as follows:

"Q. Let me ask you this: now this morning you heard the statement read to the jury which you were supposed to have signed? A. Yes, sir.

"Q. Did you sign that statement? A. Yes, sir, I did.

"Q. Is that statement true? A. Yes, sir.

"Q. Is there anything omitted out of that? Did you omit telling anything that happened that night in this statement? A. I don't understand.

"Q. Did anything happen at the house of Miss Dantzler that was not placed in this statement that you signed? A. No, sir.

"Q. You signed this statement on your own free will? A. Yes, sir.

"Q. Were you drunk? A. I wasn't drunk but I was pretty high. I had been drinking quite a bit that day.

"Q. But you weren't drunk? A. No, sir.

"Q. You are saying you remembered what happened and what you state here is the truth? A. Yes, sir."

Without having made timely motion for directed verdict upon any of the counts of the indictment, whereby it would not be considered in other than a capital case, appellant moved after verdict for judgment not-

withstanding the verdict, coupled with a motion for new trial, upon the ground, as elaborated in the brief, that, according to the testimony of the prosecutrix, there was penetration and the jury reasonably could not have found appellant guilty of assault with attempt to ravish, which they did. The appellant denied penetration, which is essential to the crime of rape. Before submission of the case to the jury the trial judge stated to counsel his intention to submit to them, and instruct them with respect to, all three counts of the indictment. He invited motions by counsel, and there was none.

This point of appellant is concluded against him by the reasoning and result of the recent case of *State v. Collins,* 228 S. C. 537, 91 S. E. (2d) 259. There was no merit in either aspect of appellant's post-verdict motion and it was properly overruled.

*In favorem vitae* we have searched the record for prejudicial error, whether the subject of exception or not, and none appears. We agree with the able and experienced trial judge in his comment at the conclusion of the trial that it is "about as clean a record" as he had ever seen.

Judgment affirmed.

TAYLOR, OXNER, LEGGE and MOSS, JJ., concur.