**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Gregory H. NEFF, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 19, 2003.

Filed Oct. 19, 2004.

Harry M. Ness, York, for appellant.

Timothy Barker, Asst. Dist. Atty., York, for Com., appellee.

Before: TODD, BENDER, and BECK, JJ.

TODD, J.

¶ 1 Gregory H. Neff appeals the judgment of sentence imposed on December 18, 2002 by the York County Court of Common Pleas, the Honorable John C. Uhler, presiding, after a jury convicted him of second-degree murder. This Court heard oral argument on this appeal on November 19, 2003. After careful review, we affirm.

¶ 2 In 1969, Lillie Belle Allen and her family, who were African–American and lived in South Carolina, were visiting Allen's sister, Hattie Dickson, in York, Pennsylvania. At that time, there were ongoing racial riots in the city of York. On July 21, 1969, after spending the day fishing, Dickson drove Allen and the other family members into York in order to go to the grocery store. As their vehicle stopped at a red light at the intersection of Philadelphia and Newberry Streets, the family noticed police officers on the sidewalks with sawhorse barricades. Dickson turned the car onto North Newberry Street, and upon reaching a set of railroad tracks, the family noticed a white male standing in the window of a nearby building with a gun pointed at them. Dickson attempted to turn the car around, but as she did so, the car was hit by a barrage of gunfire. After the shooting stopped, Allen told her sister that she was going to take the wheel. As Allen exited the car, the gunfire resumed and Allen was fatally shot.

¶ 3 On July 20, 2001, more than thirty years later, Appellant was charged with first- and second-degree murder and voluntary manslaughter for the death of Lillie Belle Allen. The evidence at trial established that at the time of Allen's murder, Appellant was 21 years old and the leader of a local city gang. On the day before Allen's murder, Appellant attended a "white power" rally near Kiwanis Lake. Several hundred people were present at the rally, including police officers. On the day Allen was killed, Appellant was on Newberry Street and observed people walking around and talking. At some point someone asked Appellant if he wanted a weapon and Appellant responded in the affirmative and selected a 20–gauge shotgun. Appellant then went to the corner of Newberry Street and the railroad tracks where there were several groups of people. As the car driven by Dickson reached the railroad tracks, Appellant heard someone shout that the car's occupants had guns. People then began firing at the car. Appellant testified that he saw an African–American female approach the trunk of the car with a gun in her hand. Appellant then fired three shots at the car, after which he retreated from the area while the gunfire continued.

¶ 4 Appellant was tried before a jury along with eight other defendants, and on October 19, 2002, he was convicted of second-degree murder. On December 18, 2002, Appellant was sentenced to 52 to 120 months incarceration. This timely appeal followed, wherein Appellant raises the following issues for this Court's review:

I. Did the prosecutor in the instant matter commit reversible error when, in his closing argument, he made an explicit reference to the Bible by stating "[t]he law has always been, thou shalt not kill"?

II. Was reversible error committed during the course of the trial due to the fact that the jurors took notes during the course of the trial and took them into the jury room during deliberations, after which the defendant was denied a hearing by the trial court to question the jurors regarding this conduct?

III. Did the trial court commit reversible error by improperly instructing the jury on the applicability of

accomplice liability to the crime of voluntary manslaughter?

IV. Did the 33 year delay between the murder of Lillie Belle Allen and the bringing of [Appellant] to trial for that offense so prejudice the proceedings, because of the unconscionable length of the delay, that no fair determination of guilt or innocence could have occurred, thereby mandating a finding of reversible error in the existing proceedings?

V. Did the various excursions of jurors from the jury room during the course of deliberations so taint the proceedings that no fair determination of guilt or innocence could have occurred, thereby constituting reversible error?

(Appellant's Brief at 8–9.) We will address Appellant's arguments *seriatim.*

¶ 5 Appellant's first argument concerns the following statement made by the district attorney in his closing argument on October 17, 2002:

> There is no it-was-a-riot defense. There was no it-was-a-crazy-time defense. Every life is sacred regardless of whether things changed between 1969 and today. The law has always been, thou shalt not kill, and in the Commonwealth of Pennsylvania before you use deadly force, you must retreat if you can do so safely.

(N.T. Trial, 10/16/02, at 4120–21.) Appellant argues that the statement "thou shalt not kill" was an impermissible reference to the Bible that constitutes reversible error. We disagree.

¶ 6 As this Court previously has explained:

> The decision whether to grant a new trial because of alleged prosecutorial misconduct rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. Rios*, 554 Pa. 419, 429–30, 721 A.2d 1049, 1054 (1998). Comments by a prosecutor do not constitute reversible error unless the language was such that its unavoidable effect was to prejudice the jury, forming in their minds fixed bias or hostility towards the defendant, so that they could not weigh the evidence objectively and render a true verdict. *Id.*

*Commonwealth v. Spotz*, 562 Pa. 498, 541–42, 756 A.2d 1139, 1163 (2000).

¶ 7 Appellant argues that the district attorney's comments in the instant case constitute reversible error *per se* under our Supreme Court's holding in *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991). In *Chambers*, our Supreme Court held that "reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se." *Id.* at 586, 599 A.2d at 644. The Court further noted that by arguing to the jury that the Bible states "and the murderer shall be put to death," the prosecutor in that case suggested to the jury "that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for [the appellant]." *Id.*

¶ 8 Appellant concedes, with respect to the instant case, that the district attorney did not refer specifically to the Bible; Appellant relies, however, on our Supreme Court's holding in *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998), wherein the Court, relying on its decision in *Chambers*, concluded that the prosecutor's reference to "a page in that book [which] says, it is better that you had a millstone tied around your neck and be cast into the deep, than that you harm a child. This is ancient law," during the penalty phase of the appellant's trial was reversible error. *Id.* at 493–95, 711 A.2d

at 457 (citation omitted). The Court acknowledged that the prosecutor did not say the word "Bible", but concluded that the language the prosecutor used was distinctive and "undeniably a direct reference to [specific] Bible passages and a violation of our stern warning to prosecutors in *Chambers.*" *Id.* at 494, 711 A.2d at 457–58.

¶ 9 Subsequent to its decision in *Brown,* our Supreme Court again had occasion to address a claim that a prosecutor impermissibly quoted from the Bible during his closing argument in *Commonwealth v. Spotz, supra.* In *Spotz,* the prosecutor, in response to an earlier statement by defense counsel that the appellant had a troubled childhood, stated during his closing argument: "Did Mark Spotz have a troubled childhood? I don't know that—I don't know that the Commonwealth would dispute that fact. But long before Dustin Spotz was killed and June Ohlinger and Penny Gunnet were murdered, Mark Spotz became a man and put away childish things." *Spotz,* 562 Pa. at 543, 756 A.2d at 1164. The appellant argued on appeal that "the prosecutor's responsive argument was a direct reference to 1 Corinthians 13:11, where St. Paul writes, 'when I was a child, I talked like a child, I thought like a child, I reasoned like a child. When I became a man, I put childish ways behind me,'" which was impermissible and constituted reversible error *per se* under *Chambers.* *Spotz,* 562 Pa. at 543, 756 A.2d at 1164.

¶ 10 In rejecting Spotz's argument, our Supreme Court explained:

First, it is not clear that the prosecutor was invoking the Bible. He certainly never mentioned the Bible by name, nor did he otherwise suggest that he was invoking the Bible. This is in sharp contrast to *Chambers,* where the reference was explicit, *see* 528 Pa. at 585, 599 A.2d at 643 (prosecutor argued, "as the Bible says 'and the murderer shall be put to death'") or *Brown,* where the reference was very thinly veiled, *see Brown,* 551 Pa. at 493, 711 A.2d at 457 (in case where defendant was convicted of killing a three-year-old child, prosecutor stated, "there is a page in that book, it says, it is better that you had a millstone tied around your neck and be cast into the deep, than that you harm a child. This is ancient law . . . .").

Here, the prosecutor's statement merely had five words in common with the passage from Corinthians. Furthermore, even if the phrase employed by the prosecutor could be said to have a biblical origin, we cannot say that this phrase was so distinctive that the jury must have believed that a religious document was being invoked. Much of our everyday speech and idiomatic expressions can be traced to biblical sources. To ban all such phrases based upon their etymology might ultimately operate to ban most speech, or certainly most speech concerning moral matters such as criminal responsibility.

More importantly, the impropriety that *Chambers* and *Brown* sought to eradicate was the invocation of biblical or religious authority *in support of* a death penalty verdict. As we explained in *Chambers:* "this argument [that the Bible supports the imposition of the death penalty] advocates to the jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for [a defendant] . . . . If a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition, not because of some other source of law." *Chambers,* 528 Pa. at 586–87, 599 A.2d at 644; *cf. Carruthers v. State,* 272 Ga. 306, 528 S.E.2d 217

(2000). We reiterated this point more recently in *Brown: "reliance* upon the Bible in any manner during a closing argument during the penalty phase is reversible error per se pursuant to *Chambers." Brown,* 551 Pa. at 493, 711 A.2d at 457 (emphasis added).

Here, the prosecutor made the alleged biblical reference as he was explaining to the jury that appellant was no longer a child and, therefore, his alleged troubled childhood could not excuse his conduct. The prosecutor did not remotely suggest that there was a biblical bias, independent of Pennsylvania law, for sentencing appellant to death. Accordingly, the prosecutor did not violate the holdings in *Chambers* and *Brown.*

*Spotz,* 562 Pa. at 544–45, 756 A.2d at 1164–65 (footnotes omitted).

██ ¶ 11 Likewise, we find that the comments made by the prosecutor in the instant case do not rise to the level of impropriety as did the prosecutor's comments in *Chambers* and *Brown.* Instantly, the district attorney did not mention the Bible by name, and though the statement "thou shalt not kill" has a biblical origin, the district attorney's comments, when viewed as a whole, did not suggest to the jury that there was a biblical basis, *independent of the law,* for convicting Appellant. Indeed, the district attorney stated "[t]he *law* has always been, thou shall not kill, and *in the Commonwealth of Pennsylvania* before you use deadly force, you must retreat if you can do so safely." (N.T. Trial, 10/16/02, at 4120–21 (emphasis added).)

¶ 12 Furthermore, as noted above, our Supreme Court in *Spotz* explained that "the impropriety that *Chambers* and *Brown* sought to eradicate was the invocation of biblical or religious authority *in support of* a death penalty verdict." *Spotz,* 562 Pa. at 544, 756 A.2d at 1164

(emphasis original). The district attorney's comments in the instant case were not made during the penalty phase of Appellant's trial. Thus, we reject Appellant's contention that the district attorney's comments constituted reversible error.

¶ 13 Appellant next argues that a new trial is required because one of the jurors took notes during the course of the trial and took those notes into the jury room during deliberations. Appellant further argues that the trial court erred in refusing to hold an evidentiary hearing on the matter. We disagree in both respects.

¶ 14 Rule 644 of the Pennsylvania Rules of Criminal Procedure provides that "[t]he jurors shall not be permitted to take notes during the course of the trial." Pa. R.Crim.P. 644. As our Supreme Court explained in *Commonwealth v. Pierce,* 453 Pa. 319, 309 A.2d 371 (1973), "it is improper for a juror to take notes and use such notes in the jury room, and if the defendant can establish prejudice from such conduct he is entitled to a new trial." *Id.* at 322, 309 A.2d at 372. It first must be noted that in the instant case, the juror who took notes did so after he went home each night, and not during the testimony or actual court proceedings. Thus, the issue is not whether the note-taking juror was distracted from the testimony itself, which is one of the rationales for the prohibition against note-taking. *See Thornton v. Weaber,* 380 Pa. 590, 112 A.2d 344 (1955). Rather, the critical issue is whether Appellant was prejudiced by the fact that the notes were taken into the jury room.

¶ 15 As the Court noted in *Pierce,* however:

[We] cannot accept the statement of jurors as to what transpired in the jury room as to the propriety or impropriety of a juror's conduct. To do so, would

destroy the security of all verdicts and go far toward weakening the efficacy of trial by jury, so well grounded in our system of jurisprudence. Jurors cannot impeach their own verdict. Their deliberations are secret and their inviolability must be closely guarded. Only in clear cases [of] improper conduct by jurors, evidenced by competent testimony, should a verdict, which is fully supported by the evidence, be set aside and a new trial granted.

453 Pa. at 322, 309 A.2d at 372 (quoting *Friedman v. Ralph Bros., Inc.*, 314 Pa. 247, 249, 171 A. 900, 901 (1934) (internal quotation marks and citations omitted)); *see also Carter v. U.S. Steel Corp.*, 529 Pa. 409, 415, 604 A.2d 1010, 1013 (1992) (plurality) ("a juror is incompetent to testify as to what occurred during deliberations"). This rule often is referred to as the "no impeachment rule." *Carter*, 529 Pa. at 415, 604 A.2d at 1013.

¶ 16 As the trial court recognized, however, there exists a narrow exception to the no impeachment rule. The exception allows "post trial testimony of extraneous influences which might have affected (prejudiced) the jury during their deliberations." *Pittsburgh Nat'l Bank v. Mut. Life Ins. Co.*, 493 Pa. 96, 101, 425 A.2d 383, 386 (1981). Extraneous information has been defined as information that was not provided in open court or vocalized by the trial court via instructions. *Boring v. LaMarca*, 435 Pa.Super. 487, 493, 646 A.2d 1199, 1202 (1994) (citing *Carter, supra*). Under the exception to the no impeachment rule, a juror "may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations." *Carter*, 529 Pa. at 415, 604 A.2d at 1013 (citing *Pittsburgh Nat'l Bank, supra*). Under no circumstances may jurors testify about their subjective reasoning processes. *Id.*

¶ 17 This Court has further explained:

[o]nce the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. *Carter*, 604 A.2d at 1016. In determining the reasonable likelihood of prejudice, the trial judge should consider: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.*, at 1016–1017. This Court has held that where the extraneous evidence is not new, but rather is evidence that was presented at trial, prejudice is not established. *See Orndoff v. Wilson*, 760 A.2d 1 (Pa.Super.2000).

*Pratt v. St. Christopher's Hosp.*, 824 A.2d 299, 303 (Pa.Super.2003), *appeal granted*, 578 Pa. 695, 851 A.2d 142 (2004). Because a trial judge may not consider evidence regarding the subjective impact of an extraneous influence on any juror, "it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one. In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence." *Carter*, 529 Pa. at 420, 604 A.2d at 1016.

¶ 18 In the instant case, following the filing of a post-trial motion for an evidentiary hearing by Appellant and his co-defendant, Robert Messersmith, the trial

judge reviewed the juror's notes, which consisted of eleven pages, and concluded:

this Court agrees, that the notes taken by Juror No. 3 constitute what may be deemed extraneous influence from one view point. The eleven pages of notes were not verbatim recitations of witness testimony or this Court's instructions[.] Yet, it is apparent, the subjective contents of the notes were summaries by Juror No. 3 of what he recalled over the course of the trial. These notes contain, *inter alia,* identification of the attorneys and their clients, physical descriptions of witnesses, summaries of testimony, and cursory credibility assessments by Juror No. 3 of some of the witnesses. Objectively scrutinized, the notes do not contain matters which were beyond that which was presented during the trial. Thus, this Court's decision to deny the Defendants' Motion on this issue rests upon a finding that the Defendants have failed to meet their burden of establishing that the notes caused a reasonable likelihood of prejudice.

Because jurors are not competent to testify as to what transpired during deliberations, this Court may not go any further than the face of the notes to determine whether a reasonable likelihood of prejudice was created by the notes that would require this Court to order a new trial. Taking all information in the notes at face value this Court finds that the Defendants have failed to prove that a reasonable likelihood of prejudice was created by the notes. Because the notes were taken daily, this Court does find that they go to a central issue in the case. The notes do however contain a very limited amount of information not directly generated from the witness stand, particularly the few credibility assessments made by Juror No. 3. This information is of the type one would expect to be discussed during jury deliberations and is one of the main functions of a jury in evaluating a witness's testimony. A juror's individual assessment of the credibility of a witness is intended to be part of the deliberation process. The notes are neither inflammatory nor emotional in nature. The indicia that perhaps brief discussion had occurred with another Juror as to the wealth or success of one of Robertson's character witness is not a central issue to either defendant Neff or Messersmith. Further, the notes do not indicate that pre-deliberations discussions constituting deliberations about the case took place.

As such, though this Court finds the notes to be an extraneous influence on the jury, the Defendants have failed to establish that they were prejudiced by the notes themselves in light of their content. This Court consequently cannot grant the Defendants an evidentiary hearing to delve further into the sanctity of the jury deliberation room which would violate the "no impeachment" rule in hopes of finding a shred of prejudice not visible on the face of the notes offered to this Court. The Jurors were instructed that it was their duty to consult with one another and that each of the Jurors must decide the case for himself or herself after there has been impartial consideration with his or her Jurors. We must presume that the instructions of this Court were adhered to, particularly since the jury was not polled.

(Trial Court Opinion, 11/15/02, at 10–12.)

 ¶ 19 Following our own careful review of the notes, we agree with the trial court's analysis and conclusions regarding the content of the notes. Furthermore, to the extent Appellant suggests that the trial judge should have conducted an evidentiary hearing on the issue of how the notes

influenced the jury, i.e., whether the notes were discussed during the jury's deliberations and whether the notes had a measurable impact on the verdict (Appellant's Brief at 33–34), we note that this is precisely the type of questioning prohibited by the no impeachment rule, since such questions pertain to the jury's subjective reasoning processes. Accordingly, we hold that the trial court did not abuse its discretion by failing to conduct an evidentiary hearing on the issue of the notes taken by a member of the jury, and we further hold that Appellant is not entitled to a new trial on this basis.

■ ¶ 20 Appellant's third allegation of trial court error concerns the court's allegedly improper jury instruction on the applicability of accomplice liability to the crime of voluntary manslaughter. As previously noted, Appellant was charged with first-degree murder, second-degree murder, and voluntary manslaughter. Appellant contends that the trial court's instructions on voluntary manslaughter were both incomprehensible and incorrect to the extent that the court advised the jury that accomplice liability does not apply to a charge of voluntary manslaughter. In response to Appellant's claim, the trial court noted, in its opinion written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, as follows:

> The jurors were instructed to sequentially address first degree murder, second degree murder and voluntary manslaughter as to [defendant Neff]. If, after concluding the Commonwealth had established its proof beyond a reasonable doubt as to the initially referenced charge, the jurors were instructed that they need deliberate no further the underlying subordinate charge. As Defendant Neff was convicted of second degree murder, whether this Court gave an improper

charge with respect to the lesser charge of voluntary manslaughter is irrelevant. Further, as counsel for the Defendant failed to object on the record to this Court's initial charge, this Court deems the issue as having been waived.

(Trial Court Opinion, 1/23/03, at 7–8.) We agree with the trial court that Appellant has waived his challenge to the trial court's jury instructions.

¶ 21 Rule 647 of the Pennsylvania Rules of Criminal Procedure provides, in relevant part: "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." Pa.R.Crim.P. 647(B). Although Appellant does not dispute that no objection to the jury charge was made in the trial court, Appellant nevertheless argues that he is entitled to review of this issue under the "basic and fundamental error" rule, which our Supreme Court had held "to apply only in those limited situations where the alleged error in the charge 'affects the merits or justice of the case or ... offends against the fundamentals of a fair and impartial trial.'" *Commonwealth v. Lassiter*, 457 Pa. 582, 589, 321 A.2d 902, 905 (1974) (citing *Commonwealth v. Jennings*, 442 Pa. 18, 25, 274 A.2d 767, 770 (1971) (plurality)). However, in *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974), our Supreme Court clarified that an allegation of basic and fundamental error will not "enable parties in criminal matters to seek reversal on alleged errors not properly raised below." *Id.* at 423, 326 A.2d at 274. Accordingly, we hold that Appellant has waived his claim regarding the trial court's erroneous jury instructions.

¶ 22 Appellant next argues that his conviction must be reversed due to the 33-year delay between Lillie Belle Allen's

murder and the time Appellant was brought to trial. Appellant asserts that due to the length of the delay, a fair determination of guilt or innocence could not have occurred. Preliminarily, we note that in *Commonwealth v. Snyder,* our Supreme Court explained that, with respect to allegations of due process violations based on pre-arrest delay, the analysis is the same under both the federal and Pennsylvania state constitutions. 552 Pa. 44, 56, 713 A.2d 596, 602 (1998).

¶ 23 The United States Supreme Court addressed the issue of pre-arrest delay, namely, delay between the occurrence of a crime and the indictment or arrest of a defendant for that crime, in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In *Marion,* the appellees were accused of engaging in a fraudulent business scheme from March 1965 through January 1966; they were not indicted on the charges until March 1970. The appellees moved to dismiss the indictment on the basis that their Sixth Amendment right to a speedy trial had been violated. The District Court for the District of Columbia granted the appellees' motion, and the United States appealed. The Supreme Court reversed, and in rejecting the appellees' speedy trial claim, opined:

> The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . .' On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. The amendment would appear to guarantee to a criminal defendant that the Government will move with the dispatch that is appropriate to assure him an early and proper disposition of the charges against him. "(T)he essential ingredient is orderly expedition and not mere speed."

404 U.S. at 313, 92 S.Ct. 455 (citation omitted).

¶ 24 After noting that the purpose of the Sixth Amendment's speedy trial provision is to prevent undue oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation, and to limit the possibility that long delay will impair the ability of an accused to defend himself, the Court further explained:

> Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These considerations were substantial underpinnings for the decision in *Klopfer v. North Carolina,* [386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) ]; *see also Smith v. Hooey,* [393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) ]. So viewed, it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer

a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.

Invocation of the speedy trial provision thus need not await indictment, information, or other formal charge. But we decline to extend that reach of the amendment to the period prior to arrest. Until this event occurs, a citizen suffers no restraints on his liberty and is not the subject of public accusation; his situation does not compare with that of a defendant who has been arrested and held to answer. Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.

*Id.* at 320–22, 92 S.Ct. 455 (footnotes omitted). The Court continued:

The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge.... These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.... Thus, there is no need to press the Sixth Amendment into service to guard against the mere possibility that pre-accusation delays will prejudice the defense in a criminal case since statutes of limitation already perform that function.

*Id.* at 322–23, 92 S.Ct. 455. Thus, under *Marion,* the Sixth Amendment does not entitle Appellant herein to relief.

¶ 25 Nevertheless, the Court in *Marion* noted:

[T]he statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus, the Government concedes that *the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.*

*Id.* at 324, 92 S.Ct. 455 (emphasis added). Ultimately, the Court in *Marion* held that the appellees had not

adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay; that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature.

*Id.* at 325–26, 92 S.Ct. 455. Thus, it is clear under *Marion* that a defendant must demonstrate actual prejudice in order to be entitled to relief based on a due process violation. *See United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (*Marion* establishes that "proof of actual prejudice makes a due process claim concrete and ripe for adjudication"); *Snyder,* 552 Pa. at 54, 713 A.2d at 601 (*Marion* and *Lovasco* stand for the

proposition that to establish a due process violation for a delay in prosecution, a defendant must show that the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution); *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987) (when a defendant argues undue delay in the filing of charges, proof of prejudice is a prerequisite to consideration of whether there has been a denial of due process); *Commonwealth v. Patterson*, 392 Pa.Super. 331, 572 A.2d 1258 (1990) (appellant failed to establish due process violation for 22-year delay in prosecution since he failed to show that the delay caused substantial prejudice).

¶ 26 In *Commonwealth v. Scher*, 569 Pa. 284, 803 A.2d 1204 (2002) (plurality), our Supreme Court explained:

> In order for a defendant to show actual prejudice, he or she must show that he or her ability to defend against the state's charges to such an extent that the disposition of the criminal proceedings was likely affected. This kind of prejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of an essential witness. It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time.

*Id.* at 314, 803 A.2d at 1222 (citations omitted).

¶ 27 We note that in his brief to this Court, Appellant offers absolutely no evidence to suggest that he suffered actual prejudice as a result of the delay between the commission of the crime and the time he was brought to trial.[1] As a result of Appellant's failure to allege or demonstrate that he was prejudiced by the delay, we do not reach the issue of the propriety of the delay, and hold that Appellant is not entitled to relief on the basis that the delay violated his due process rights.

¶ 28 Finally, Appellant argues that he is entitled to a new trial because several of the jurors were observed on a balcony overlooking the front steps of the courthouse prior to the announcement of the verdict. Appellant relies on *Commonwealth v. Gockley*, wherein our Supreme Court stated:

> It is a well-established *general rule* that once a jury has been sworn in a capital case, its members may not separate until they have been discharged .... But we are living in a modern and practical

---

1. Appellant contends that in the instant case, prejudice should be presumed, and that it should be the Commonwealth's burden to rebut such presumption, and in doing so relies on *Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), and *Heiser v. Ryan*, 813 F.Supp. 388 (W.D.Pa.1993). In *Doggett*, the United States Supreme Court noted that official negligence in bringing an accused to trial occupies the "middle ground" between diligent prosecution and bad faith delay and stated "[w]hile not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Doggett*, 505 U.S. at 656–57, 112 S.Ct. 2686. In *Heiser*, the district court opined that "*Doggett* requires relief when the government has been negligent and the defendant bears no responsibility for the resulting delay, unless the government 'persuasively rebut[s] the presumption of prejudice,'" *Heiser*, 813 F.Supp. at 397, but, following a hearing, ultimately concluded that Heiser was not entitled to relief because he had not suffered the requisite prejudice. We find Appellant's reliance on *Doggett* and *Heiser* to be misplaced, since neither involved the issue of pre-arrest delay. Rather, *Doggett* involved an 8½-year delay between the appellant's indictment and his arrest, while *Heiser* involved a thirteen-year delay in ruling upon the appellant's motion to withdraw his guilty plea.

age and there are exceptions to nearly every general rule. This Court has repeatedly held that the separation of the jury *even in a capital case* will not justify the grant of a new trial if it *clearly appears* that a juror was not improperly influenced and that the defendant was not prejudiced by what transpired.

411 Pa. 437, 457–58, 192 A.2d 693, 703 (1963) (citations omitted) (emphasis original).

¶ 29 In *Gockley,* following a Saturday session of trial, the trial court called a recess until Monday. Upon learning that certain members of the jury wished to attend church on Sunday, the trial judge granted them permission to do so. The jurors were to be accompanied by a bailiff, and were to be seated in a separate section of the church, and the appellant apparently agreed to the arrangement. Ultimately, there was no evidence that any jury member had availed himself of the opportunity to attend mass. However, one of the jurors went unaccompanied to the hotel barber shop for a haircut without permission of the court.

¶ 30 Based on the foregoing, the appellant argued that he was entitled to a new trial. The trial court refused the appellant's request, and stated

> [w]e are completely satisfied that if in fact the two incidents complained of amounted to a separation of the jury the record indicates conclusively that no harm resulted to the defendant. His counsel do not attempt to set forth how their client was prejudiced in any way. Separation of the jury, even in a capital case, does not necessarily require the granting of a new trial if no harm or prejudice resulted to the defendant as a result of the separation.

*Id.* at 457, 192 A.2d at 703. Our Supreme Court affirmed, stating "the evidence as to the temporary separations of the jury in the instant case showed that there had been no prejudice to the appellant, and we are convinced that the trial Judge did not abuse his discretion." *Id.* at 459, 192 A.2d at 704.

¶ 31 With regard to the case *sub judice,* we first note that, to the extent Appellant suggests in his statement of questions presented on appeal that the jurors left the jury room *during the course of deliberations,* this statement is inaccurate. Indeed, the jury had already reached its verdict at the time several jurors were observed on the courthouse balcony; the verdict had not, however, been announced in court.

¶ 32 Furthermore, the Court in *Gockley* explained that "a new trial will not be granted unless the alleged misconduct was prejudicial to the accused" and that "[s]uch matters rest largely in the discretion of the trial judge." *Id.* at 458, 192 A.2d at 704 (citing, *inter alia, Commonwealth v. Kosh,* 305 Pa. 146, 158, 157 A. 479, 483 (1931) (emphasis omitted)). Although Appellant asserts that jury members were within eye and earshot of the steps below the balcony, where the media and other court personnel often were present, Appellant fails to offer any evidence that there were, in fact, news media or court personnel present at that time, and Appellant fails to allege how he might have been prejudiced even if there had been, since the jury already had arrived at its verdict. Accordingly, we will not disturb the trial court's determination that Appellant was not prejudiced by the separation of the jury prior to the announcement of its verdict.

¶ 33 For all of the foregoing reasons, we affirm Appellant's judgment of sentence.

¶ 34 Judgment of sentence **AFFIRMED.**

¶ 35 BECK, J. files a Concurring Statement.

BECK, J., Concurring.

¶ 1 I join the majority opinion in all respects, but write separately for the purpose of urging the rescission of Pa. R.Crim.P. 644, which prohibits jurors from taking notes during the course of a trial.

¶ 2 A plea for Pennsylvania to join the ranks of virtually every other state in the union, as well as the entirety of the federal courts, in permitting note-taking by jurors is not new. Indeed, at this point, practitioners, judges, legislators, state and local bar associations, various court reform organizations and commissions, and even the state Criminal Rules Procedural Committee, have come out in favor of allowing jurors to take notes.[2]

¶ 3 The prohibition against note-taking arose because of perceived inequities between literate and illiterate jurors in the nineteenth century. While that concern has "largely dissolved," see Penrod & Heuer, *Tweaking Common Sense: Assessing Aids to Jury Decision Making*, 3 Psychol. Pub. Pol'y & L. 259, 263 (1997), and the "clear weight of authority" now permits jury note-taking, see Pertnoy, *The Juror's Need to Know vs. the Constitutional Right to a Fair Trial*, 97 Dick. L.Rev. 627, 633 (1993), Pennsylvania remains one of the few states that does not permit juror note-taking in some form. Instead, it appears that this Commonwealth is the only state that expressly prohibits jurors from taking notes.[3]

¶ 4 Note-taking by jurors has been recognized as valuable for decades. Jurors, sitting as the finders of facts, are asked to listen to multiple witnesses testifying over a period of days, and sometimes weeks, on often complex and detailed information. The charges, too, are often multiple, each requiring different elements and states of mind. To expect jurors to determine whether the Commonwealth has met its burden without the assistance of notes is unrealistic. Certainly, throughout a trial, defense counsel makes notes, the prosecutor makes notes and the trial judge makes notes. The prohibition against allowing the *decision-makers* in a case to take notes simply defies logic. The jurors, the only courtroom participants other than the defendant who are not learned in the law, should be permitted to commit to paper the evidence they deem worthy of recording.

¶ 5 Yet, juror note-taking remains forbidden in Pennsylvania despite countless studies showing the benefits jurors gain from note-taking, including refreshing their memories and focusing their concentration, *United States v. Maclean*, 578 F.2d 64, 66 (3d Cir.1978), allowing them to absorb and synthesize information more readily, *People v. Hues*, 92 N.Y.2d 413, 681 N.Y.S.2d 779, 704 N.E.2d 546, 549 (1998),

2. Currently, there exists in Pennsylvania a pilot program allowing note-taking in civil trials that last for more than two days. Set out at Pa.R.Civ.P. 223.2, it is a temporary provision "promulgated for the purpose of assessing whether juror note-taking in civil cases is beneficial to the system of justice in Pennsylvania." Pa.R.Civ.P. 223.2, Explanatory Comment. The Rule will be automatically rescinded on December 31, 2005. Pa. R.Civ.P. 223.2(e). This concurring statement addresses the Rules of Criminal Procedure, specifically Rule 644.

3. South Dakota, sometimes thought of as the only other state that prohibits note-taking by jurors in criminal trials, has a statutory provision setting out those items that jurors in criminal trials are permitted to bring into their deliberations. The law provides that only exhibits entered into evidence at trial may accompany jurors into the deliberation room. See S.D. Codified Laws § 23A–25–7. This criminal law provision is unlike its civil counterpart, which explicitly states that jurors "may also take with them [into deliberations] notes of the testimony or other proceedings on the trial taken by themselves." S.D. Codified Laws § 15–14–20.

and aiding their comprehension. Pennsylvania Criminal Procedural Rules Committee Proposed Rule 644, 33 Pa. Bulletin 2164. Even more significant is the fact that these same studies have debunked most of the proffered reasons against note-taking, *i.e.,* that jurors may overemphasize the evidence they have noted, that jurors cannot keep pace with the trial while taking notes, that note-taking jurors distract other jurors and have an undue influence over non-note-takers, and that note-taking favors either the prosecution or the defense. *See* Penrod & Heuer, *supra,* at 271. *See also* the National Center for State Courts website at *http://www.ncsconline.org/WC/FAQs/JurInnFAQ.htm.*

¶ 6 In light of all the data on this issue, it is only logical to conclude that the act of taking notes helps to keep jurors focused and minimizes the danger that their minds will wander from the drama unfolding before them. Later, during deliberations, the notes may serve to foster meaningful and comprehensive discussion of the issues raised at trial.

¶ 7 In my view, credible and reliable support for juror note-taking has been in place for well over forty years, even before the Federal Judicial Conference Committee recommended that it be permitted. *See* The Jury System in the Federal Courts: Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 411 (1960) (suggesting that jurors be allowed to take notes at the discretion of the trial judge). The extensive state and federal jurisprudence that has developed since that time has served only to bolster that support. *See generally, Taking and Use of Trial Notes by Jury,* 36 A.L.R. 5th 255.

¶ 8 In 2003, the Pennsylvania Criminal Procedural Rules Committee set forth an extensive proposal to lift the ban on jury note-taking and put in its place a precise framework setting out the manner in which note-taking may be accomplished, the use for which notes may be had, the confidential nature of such notes and the destruction of same. In addition, the Committee set out a detailed and thorough instruction, to be given by the trial judge to the jury, explaining the complete note-taking procedure. This action by the Committee followed repeated suggestions from the Pennsylvania bench and bar calling for removal of Rule 644, as well as four successive legislative sessions that saw the introduction, though not passage, of a bill to allow jury note-taking. Still, Rule 644 remains in effect.

¶ 9 Clearly, the wisdom and practicality of permitting jurors to take notes is best exemplified in a case such as the one before us, which involved multiple defendants, numerous attorneys, and dozens upon dozens of witnesses who testified about events that occurred several decades ago. However, the value of jury note-taking exists in every case and, in light of the fact that its benefits outweigh its dangers—real or perceived—I believe it should be allowed. I am convinced that juror note-taking enhances the reliability of verdicts.

¶ 10 The time has come for Pennsylvania to rescind its rule prohibiting jurors from taking notes and to adopt a rule permitting them to do so. The Honorable Richard C. Wesley of the New York Court of Appeals, in explaining why he was certain that note-taking by jurors should be permitted, eloquently stated that to do so would "respond to contemporary challenges facing our jury system, the overwhelming authority of Federal and other State courts, and a healthy dose of common sense." *People v. Hues, supra,* at 414–15, 681 N.Y.S.2d 779, 704 N.E.2d 546. I wholly concur.