J-S27016-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MAURICE DEWAYNE WAKEFIELD, II | : | |
| | : | |
| Appellant | : | No. 1306 WDA 2018 |

Appeal from the Judgment of Sentence Entered July 12, 2018
In the Court of Common Pleas of Blair County
Criminal Division at No(s):  CP-07-CR-0001313-2017

BEFORE:   OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OTT, J.:                    FILED NOVEMBER 8, 2019

Maurice Dewayne Wakefield, II, appeals from the judgment of sentence imposed July 12, 2018, in the Blair County Court of Common Pleas, made final by the denial of post-sentence motions on August 7, 2018.  On April 5, 2018, a jury convicted Wakefield of involuntary deviate sexual intercourse (by forcible compulsion) ("IDSI"), criminal conspiracy to commit IDSI, aggravated assault, assault by a prisoner, terroristic threats, unlawful restraint, false imprisonment, simple assault (causing bodily injury), simple assault (by physical menace), and reckless endangering another person ("REAP").[1]  The

_____

* Retired Senior Judge assigned to the Superior Court.

[1]  See 18 Pa.C.S. §§ 3123(a)(1), 903, 2702(a)(1), 2703(a), 2706(a)(1), 2902(a)(1), 2903(a), 2701(a)(3), 2701(a)(1), and 2705, respectively.

trial court sentenced Wakefield to an aggregate term of nine to 18 years' incarceration. On appeal, Wakefield alleges the trial court erred in failing to grant a mistrial and raises an admissibility of evidence claim. For the reasons below, we affirm the judgment of sentence.

The facts and procedural history are as follows. On March 16, 2017, the victim, C.S., was an inmate at Blair County Prison, when he was transferred from F Block to E Block due to an internal infraction. At the time of entering E Block, C.S. had hidden amounts of loose tobacco and cigarettes in his shoes and rectum. He shared the cigarettes, from his socks, with fellow inmates throughout the day in exchange for contraband and commissary items. He also told others he had more but that he had to get it out of his rear.

At approximately 8:30 p.m. that evening, C.S.'s cellmate, F.D.F., had taken a shower and was returning to his cell when he was approached by fellow inmates, Allen Grager, Curtis Ramsey, and Zachary Moore. They grabbed him, threw him to the floor, and then held him down. See N.T., 4/2/2018, at 104. Moore held a "shank" to F.D.F. and said "he was gonna cut [F.D.F.]'s throat." Id. at 105. They told F.D.F. to "give up the shit, give up [C.S.'s] tobacco[.]" Id. at 104. They believed he was holding it for C.S. F.D.F. said he did not have the contraband and managed to get away from the men. Grager, Ramsey, and Moore then left the cell.

Later that night, between 9:00 p.m. and 10:00 p.m., C.S. was watching television in the cellblock's common area when another inmate, Dalaun

Carroll, motioned for him to enter Cell #1. C.S. stood by the toilet in the corner of the room, while Wakefield, Charles Frank, Grager, and Moore formed a semi-circle around him. Ramsey, described as a big man, stood at the door. The men started harassing C.S., demanding that he give up the tobacco, and saying that removal of the tobacco could be done "the easy way" or "the hard way." Id. at 182. Frank even indicated that he preferred "to do it the hard way." Id. at 184. C.S. tried to extract the tobacco through peristaltic action for approximately ten minutes. He noticed that Carroll was walking back and forth between the cell and speaking with a guard,[2] while Grager left to procure rubber gloves. Grager arrived back with the gloves and handed them over to Frank, who then put the gloves on. C.S. was removed from the toilet by Grager and Moore, turned around, and then Frank attempted to find the bag of tobacco in C.S.'s rectum by using his hand. When Frank was unable to obtain the contraband, C.S. stated that he felt a hard object being used in his rectal cavity for several more minutes.[3] After the group was still not able to pull the bag of tobacco from C.S.'s rectum, they punched and kicked him multiple times, including his head and ribs. His one ear "was split, ripped almost in half." Id. at 195. The men also removed C.S.'s shoes and took

_____

[2] Carroll told the guard what the men were up to and indicated the guard asked for details but did not stop the assault. N.T., 4/3/2018, at 39.

[3] It was later determined that two toothbrushes were used, but C.S. did not identify which of the men violated him with those objects.

them. Id. at 199. There was blood and feces all over the toilet, on the floor, and in C.S.'s underwear. Id. at 202. Wakefield threw a towel at C.S. and told him to clean himself up as well as keep his mouth shut. Id. at 203-204.[4] After returning to his cell, C.S. pushed the bag of tobacco out of his rectum and tossed it over to Cell #9 and Cell #10, where the other men were located. The following day, one of C.S.'s cellmates helped him seek medical assistance, and C.S. eventually told police about the assault.

Wakefield and his cohorts were subsequently charged with multiple offenses related to the incident. The matter proceeded to a jury trial on April 2, 2018, where Wakefield and Frank were tried together. Video surveillance from the jail was shown to the jury with regard to the two assaults of Schultz and F.D.F. On April 5, 2018, the jury convicted Wakefield of IDSI, criminal conspiracy to commit IDSI, aggravated assault, assault by a prisoner, terroristic threats, unlawful restraint, false imprisonment, two counts of simple assault, and REAP. On July 12, 2018, the court sentenced Wakefield to the following: (1) a term of five to ten years' confinement for the IDSI offense; (2) a concurrent term of five to 10 years' imprisonment for the conspiracy conviction; (3) a consecutive term of three to six years' incarceration for the aggravated assault crime; (4) a consecutive term of one to two years'

_____

[4] Another inmate, Kevin Claar, who witnessed part of the incident, described Wakefield as "the muscle" and "if things got rough, … those were the guys that took care of things." N.T., 4/3/2018, at 167.

confinement for the assault by a prisoner conviction; and (5) concurrent terms of two years' probation each for terroristic threats and unlawful restraint.[5] Wakefield filed a post-sentence motion, which was denied on August 7, 2018. This appeal followed.[6]

In his first argument, Wakefield contends the trial court should have granted his post-sentence motion for a new trial due to the fact that the jury was not informed that they could use their notebooks during co-defendant Frank's direct testimony. See Wakefield's Brief at 11. He points to Frank's direct examination testimony, which took place on the third day of trial,[7] and states these statements by Frank "may have caused jurors to reconsider whether the victim was actually assaulted [by] him[:]"[8]

> [Counsel for Frank]: And when you said [Shutlz] got it; what are you talking about?
>
> [Frank]: The tobacco in his rectum.

_____

[5] No further penalty was imposed with respect to the remaining convictions.

[6] On September 7, 2018, the trial court ordered Wakefield to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Wakefield filed a concise statement on September 28, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on October 26, 2018.

[7] Counsel for the co-defendants did not give their opening statements until after the Commonwealth's case had rested. Notes were not allowed during the opening statements. Frank's testimony took place immediately after counsel for the co-defendants' opening statements. The trial court inadvertently neglected to remind the jury about the use of the notebooks on Frank's direct examination. As will be discussed below, no objection was raised until after Frank's cross-examination was completed.

[8] Wakefield's Brief at 11.

[Counsel for Frank]: At any point did you see the tobacco in a bag or plastic baggie or anything?

[Frank]: Yes at one point and time after he ---- he was pushing and it was getting really close to --- it was about I want to say -- -- Dalaun Carroll came down I want to say he said it was about five till [10 p.m.] we only had a couple minutes. [C.S.] stood up from the toilet and he bent over by himself; nobody held him; nobody touched him and he turned around; he was so scared this man would have did anything --- like I'm not happy about what I'm saying but I'm just telling you the truth the man was so scared I had him so terrorized that he bent over the sink himself; he was willing to bend over the sink himself and told me just don't hurt me; be gentle and when I looked at him this bag was coming out of him and it was so big --- it was --- the only zip lock baggies in the prison are not the little sandwich baggies; they have what they call an indigent pack for shampoo and stuff; these were gallon zip lock baggies and this was packed with two four ounce bags of tobacco and it was coming out and when I seen it, I didn't touch it; I couldn't; I didn't touch it; I didn't want to touch it; it was disgusting; there was crap all over it and I started gagging and I never touched it.

[Counsel for Frank]: What happened next?

[Frank]: Then we took --- it got close to time and I told him I said you know what I said just go back to your cell; I said do I have to walk up with you; you better not tell nothing; this, you know, it's all good if you just give me the stuff whenever you said it ---- you know send it over to my cell and he said okay and he stood up and you could see he was in pain; the reason he was in pain was you could tell because the bag was half hanging out of the man and I told him I said clean yourself up and walk up to your cell.

...

[Counsel for Frank]: Okay at any time did you put your fingers into [C.S.]'s anus?

[Frank]: Never; when that bag was ---- I mean I bluffed him; I did say it; I did honestly tell him I was going to but when that bag was coming out and he turned around like it was just the most disgusting sight I ever seen.

[Counsel for Frank]: At any time did you use any instrument, toothbrush, bottle, anything to insert into his anus?

[Frank]: Never; I never touched him whatsoever.

[Counsel for Frank]: Now you have a long history of criminal behavior and being incarcerated so you know many people wouldn't believe what you say; you're under oath today is there anything you want to change about what you told these jurors this afternoon?

[Frank]: No I'd just like to add one thing about my criminal history, you know, like I said I'm not proud of what I've done, but one thing about me is I've never told on nobody to get a deal; I've never asked for mercy; I've always took what my punishment for what I've done, and I have no problem sitting here today from the day one that these charges were filed for taken my responsibility for what I've done, but there's charges in here that I did not do that I do not feel I deserve[] to take time for.

N.T., 4/4/2018, at 145-149. After cross-examination was about to begin, the tipstaff asked the court if the jurors were allowed to use their notebooks, which the court answered in the affirmative. See id. at 152.

Wakefield states:

This is key testimony for a denial of the charge of ISDI by the supposed main actor in the crimes against defendant Frank and [Wakefield]. No notes by the jury to refer to during jury deliberations. And no real method agreed to or ordered by the [t]rial [c]ourt to correct the mistake.

Wakefield's Brief at 12. He notes the jurors did receive their notebooks in time for Frank's cross-examination. Id. at 12-14, citing N.T., 4/4/2018, at 154-12. Wakefield asserts:

[The prosecutor] in his cross-examination injected his theory of what he assumed transpired in Cell #1 with what he thought may have happened. If the members of the jury deliberated with their

notes at hand they only had one half of the testimony to refer back to – the Commonwealth's side. Much of [the prosecutor's] questions began with the phrase, "you expect this jury to believe," which takes Frank's testimony and throws a negative light on it. The positive testimony of Frank on direct examination is not there for the jury to reference. There is no fair way for the jurors to judge the truthfulness of Frank's testimony other than their memories. This puts [Wakefield] at a disadvantage in the jury room.

Wakefield's Brief at 14 (citation omitted). Lastly, Wakefield complains:

The other aspect of the notebook mistake is that the Court's only solution was to afford a remedy only if the jurors raised the issue in their deliberations. [N.T., 4/5/2018, at 1-2]. The jurors never did raise the issue and thus there was nothing that existed to rectify. But the Court's remedy is not fair to either [Wakefield] or Mr. Frank. At a minimum, the Court should have directed that the jury be given time after his testimony to write notes. [Wakefield's] counsel did ask the Court; in chambers, to allow the jury to have a transcript of Mr. Frank's testimony in the jury deliberations. Id. The Court denied this request. However, another solution should have been available such as reading back his testimony for the jury before the trial had completed, with the jurors allowed to take notes of the read-back.

...

In [Wakefield's] case here, there was no attempt by the Court (or motions by Defense) to obtain juror's notebooks to determine whether the lack of notes may have prejudiced [Wakefield].

Wakefield's Brief at 14-15.

Pennsylvania Rule of Criminal Procedure 644 governs note taking by jurors and provides:

(A) When a jury trial is expected to last for more than two days, jurors shall be permitted to take notes during the trial for their use during deliberations. When the trial is expected to last two days or less, the judge may permit the jurors to take notes.

(1) The jurors shall not take notes during the judge's charge at the conclusion of the trial.

(2) The court shall provide materials to the jurors that are suitable for note taking. These are the only materials that may be used by the jurors for note taking.

(3) The court, the attorney for the Commonwealth, and the defendant's attorney, or the defendant if unrepresented, shall not request or suggest that jurors take notes, comment on the jurors' note taking, or attempt to read any notes.

(4) The notes of the jurors shall remain in the custody of the court at all times.

(5) The jurors may have access to their notes and use their notes only during the trial and deliberations. The notes shall be collected or maintained by the court at each break and recess, and at the end of each day of the trial.

(6) The notes of the jurors shall be confidential and limited to use for the jurors' deliberations.

(7) Before announcing the verdict, the jury shall return their notes to the court. The notes shall be destroyed by court personnel without inspection upon the discharge of the jury.

(8) The notes shall not be used as a basis for a request for a new trial, and the judge shall deny any request that the jurors' notes be retained and sealed pending a request for a new trial.

(B) The judge shall instruct the jurors about taking notes during the trial. At a minimum, the judge shall instruct the jurors that:

(1) the jurors are not required to take notes, and those jurors who take notes are not required to take extensive notes;

(2) note taking should not divert jurors from paying full attention to the evidence and evaluating witness credibility;

(3)   the notes merely are memory aids, not evidence or the official record;

(4)   the jurors who take few or no notes should not permit their independent recollection of the evidence to be influenced by the fact that other jurors have taken notes;

(5)   the jurors may not show their notes or disclose the contents of the notes to other jurors until deliberations begin, but may show the notes or disclose the contents during deliberations;

(6)   the jurors may not take their notes out of the courtroom except to use their notes during deliberations; and

(7)   the jurors' notes are confidential, will not be reviewed by the court or anyone else, will be collected before the verdict is announced, and will be destroyed immediately upon discharge of the jury.

Pa.R.Crim.P. 644.

Here, the trial court found the following:

While Rule of Criminal Procedure 644 does not specifically address whether or not the jurors are permitted to take notes during opening statements and closing arguments, this Court has always taken the approach that the note taking would occur during the taking of evidence only and not during counsels' arguments.  In this particular case, both defense counsel decided to defer their opening statements until after presentation of the Commonwealth's case in chief.  Therefore, the opening statements of defense counsel did not begin until day three of the trial.  The third day of the trial was April 4, 2018.  Just prior to counsel for co-defendant Charles Frank providing his opening statement, this Court indicated the following to the jury:

"If [counsel for Frank] chooses [to make an opening statement,] then you remember what I told you at the beginning of the trial that the opening statements of the Commonwealth and defense attorneys are not evidence so therefore we will not want you to use - you should be putting your notebooks back in your folder until after the opening

- 10 -

statement is over with.  We'll only be taking - you will only be taking notes during the actual testimony so I apologize for not reminding you of that; I see some of you are doing that now so anyone who has a notebook should put it in their envelope until we begin testimony again."

(Trial transcript, day 3, page 132)

Neither counsel presented an objection to the Court deciding not to allow the jurors to take notes during the opening statement of counsel for codefendant Charles Frank.  After conclusion of Charles's [sic] Frank's counsel's opening statement, counsel began his direct examination of Mr. Frank.  At the conclusion of a sidebar conference that occurred after the direct examination of Mr. Frank by his counsel, a tipstaff asked the Court in the presence of the jury whether or not the jurors were allowed to use their notebooks.  It appears to this Court that some of the jurors may have forgotten that the Court informed them that they could begin to use their notebooks again once testimony resumed.  In response to the tipstaff's question, the Court informed the jurors in open court as follows:

"Yes ladies and gentlemen, you are allowed to use your tablets now since testimony has resumed for whoever asked that question okay so during any and all testimony you are permitted to use the notebooks."

(Trial transcript day 3, page 152)

At the completion of day three of the trial, the Court excused the jurors and addressed various matters with counsel outside the presence of the jury.  During this time, counsel for the Commonwealth and counsel for both Defendants interacted with the Court concerning the possibility that some of the jurors were not taking notes during Mr. Frank's direct testimony (Pages 172-178).  During this interaction, counsel for Mr. Wakefield specifically requested that the Court have the direct examination of Mr. Wakefield transcribed and that that transcription be provided to the jury during their deliberations.  Upon that request from Mr. Wakefield's counsel, the Court indicated that we would take the matter under advisement and make a decision prior to closing arguments.  On the morning of day four of the trial, the Court indicated to counsel that the request for the jury to be provided a copy of Mr. Frank's direct testimony during their

- 11 -

deliberations would be denied. We indicated that we would reconsider this ruling if the jury asked for any portion of that testimony. No attorney indicated an objection to the Court's decision.

This Court believes that our handling of the "notebook" issue was appropriate. At the outset, we point out that we had informed the jurors prior to Charles Frank's counsel's opening statement that they would be able to resume taking notes after the opening statement was completed. Therefore, this Court does not believe that we erred simply because some of the jurors may have misunderstood our instruction. We believe that it was not appropriate to provide the transcript of the direct examination of one of the defendants to the jury during their deliberations. We believe that this would unnecessarily have highlighted this testimony with the jury as opposed to other testimony. As indicated, we informed counsel that we would reconsider if the jury raised any issue during their deliberations on this issue which did not occur.

Trial Court Opinion, 10/26/2018, at 6-8 (italics removed).

We agree with the trial court's conclusion. First, counsel for Wakefield never objected when the tipstaff asked the court if the jury could use their notebooks during Frank's testimony. See N.T., 4/4/2018, at 152.[9] The issue was not brought to the court's attention until after cross-examination was completed. See id. at 173. Furthermore, counsel for Wakefield did not object when the court stated it would reconsider its decision if the jury asked for any portion of the testimony at issue. N.T., 4/5/2018, at 2. We note the following:

"The absence of a contemporaneous objection below constitutes a waiver of the claim on appeal." Commonwealth v. Rodriguez,

---

[9] Counsel for Wakefield also did not request the jury be polled to see if they needed a recitation regarding Frank's testimony or an instruction with respect to the matter. In a related matter, counsel for Frank did not object or make any requests with regard to the issue. See N.T., 4/4/2018, at 175-176.

2017 PA Super 364, 174 A.3d 1130, 1145 (Pa. Super. 2017) (citing Commonwealth v. Powell, 598 Pa. 224, 956 A.2d 406, 423 (Pa. 2008)). Our Supreme Court has stated:

> [I]t is axiomatic that issues are preserved when objections are made timely to the error or offense. See Commonwealth v. May, [] 584 Pa. 640, 887 A.2d 750, 761 ([Pa.] 2005) (holding that an "absence of contemporaneous objections renders" an appellant's claim waived); and Commonwealth v. Bruce, [] 2007 PA Super 4, 916 A.2d 657, 671 ([Pa. Super.] 2007), appeal denied, []593 Pa. 754, 932 A.2d 74 ([Pa.] 2007) (holding that a "failure to offer a timely and specific objection results in waiver of" the claim). Therefore, we shall consider any issue waived where Appellant failed to assert a timely objection.

Commonwealth v. Baumhammers, 599 Pa. 1, 960 A.2d 59, 73 (Pa. 2008).

Commonwealth v. Smith, 213 A.3d 307, 309 (Pa. Super. 2019). Accordingly, Wakefield's argument is waived for failure to raise a contemporaneous objection at the time when the note-taking issue was brought to the court's and the parties' attention.

Second, pursuant to Rule 644, neither the court nor the parties can "request or suggest that jurors take notes, comment on the jurors' note taking, or attempt to read any notes." Pa.R.Crim.P. 644(A)(3).[10] Moreover,

_____

[10] We note that Wakefield relies on Commonwealth v. Neff, 860 A.2d 1063, (Pa. Super. 2004), appeal denied, 878 A.2d 863 (Pa. 2005), for the argument that "there was no attempt by the Court (or motions by Defense) to obtain juror's [sic] notebooks to determine whether the lack of notes may have prejudiced" him. Wakefield's Brief at 15. However, Wakefield's reliance on that case is misplaced because Rule 644 was amended in 2005, after the Neff decision. Prior to that time, the then-existing Rule 644 prohibited jurors from taking notes. The Rule now provides, in pertinent part, that the court "shall

"the jurors are not required to take notes." Pa.R.Crim.P. 644(B)(1). As the court noted, this specific jury was "not a note taking group by majority" and there were "only a few that … appeared to be even taking any notes[.]" N.T., 4/4/2018, at 177.

Additionally, Wakefield's request for relief was that Frank's direct examination testimony be provided to the jury during deliberations. See N.T., 4/4/2018, at 176; N.T., 4/5/2018, at 1. However, pursuant to Pennsylvania Rule of Criminal Procedure 646(C)(1), a jury is not permitted to have a transcript of any trial testimony during deliberations. Therefore, the trial court could not send the transcript of Frank's direct examination testimony out with the jury during deliberations.

Lastly, we agree with the court's rationale that "it was not appropriate to provide the transcript of the direct examination of one of the defendants to the jury during their deliberations" and "this would unnecessarily have highlighted this testimony with the jury as opposed to other testimony." Trial Court Opinion, 10/26/2018, at 8. Accordingly, Wakefield's first argument is waived and even if it were not, we find it to be meritless.

Next, Wakefield argues the court "abused its discretion by denying his post-sentence motion for a new trial due to extraneous video evidence of other

_____

not … attempt to read any notes." Accordingly, the court in the present matter would not be permitted to read the jury's notebooks to determine whether a lack of notetaking caused prejudice to Wakefield.

- 14 -

non-participating defendants['] alleged activities surrounding the alleged assault of F.D.F. who was in his cell, Cell #7." Wakefield's Brief at 15. "We recognize that '[q]uestions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion.'" Smith, 213 A.3d at 309, quoting Commonwealth v. Young, 989 A.2d 920, 924 (Pa. Super. 2010) (citations omitted).

However, our review of the record reveals that Wakefield failed to object to the introduction of the video surveillance evidence concerning the actions that took place in Cell #7 concerning F.D.F. or the testimony regarding such evidence. See N.T., 4/2/18, at 2-250; see also Wakefield's Brief at 15 (Wakefield "did not object to the video evidence of the activities surrounding Cell #7 during the trial"). Accordingly, Wakefield again failed to properly preserve this argument for appellate review, and we are constrained to conclude his second issue is waived. See Smith, 213 A.3d at 309; see also Pa.R.A.P. 302(a).

Furthermore, even if the issue were not waived, the video surveillance evidence appears to be admissible under the res gestae exception to Pa.R.E. 404(b) (evidence concerning crimes, wrongs, or other acts) because it was "relevant to furnish the complete story or context of events surrounding the crime." Commonwealth v. Weiss, 81 A.3d 767, 798 (Pa. 2013). The video

surveillance was part of the entire event, demonstrating to the jurors what transpired in the attempts to obtain the victim's tobacco.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2019